1  NICOLA T. HANNA
   United States Attorney
2  CHRISTOPHER D. GRIGG
   Assistant United States Attorney
3  Chief, National Security Division
   ANIL J. ANTONY (Cal. Bar No. 258839)
4  Assistant United States Attorney
   Deputy Chief, Cyber & Intellectual Property Crimes Section
5  KHALDOUN SHOBAKI (Cal. Bar No. 232864)
   Assistant United States Attorney
6  Cyber & Intellectual Property Crimes Section
        1500 United States Courthouse
7        312 North Spring Street
        Los Angeles, California 90012
8        Telephone: (213) 894-6579/0759
        Facsimile: (213) 894-2927
9        Email:     anil.j.antony@usdoj.gov
                    khaldoun.shobaki@usdoj.gov
10

11 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

12                UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,           No. 2:20-cr-00576 -MCS

15            Plaintiff,               PLEA AGREEMENT FOR DEFENDANT
                                       GHALEB ALAUMARY
16            v.

17 GHALEB ALAUMARY,
      aka "G,"
18    aka "Backwood,"
      aka "Big Boss,"
19
              Defendant.
20

21      1.    This constitutes the plea agreement between defendant

22 GHALEB ALAUMARY, also known as ("aka") "G," aka "Backwood," aka "Big

23 Boss" ("defendant"), and the United States Attorney's Office for the

24 Central District of California ("the USAO") in the above-captioned

25 case.  This agreement is limited to the USAO and cannot bind any

26 other federal, state, local, or foreign prosecuting, enforcement,

27 administrative, or regulatory authorities.

28

FILED
CLERK, U.S. DISTRICT COURT

11/17/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a one-count Information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Conspiracy to Engage in Money Laundering in violation of 18 U.S.C. § 1956(h).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.   Authorize the USAO to obtain a credit report immediately upon defendant's entry of a guilty plea.

i.   Consent to the USAO inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

2

GA

1         j.    Complete the Financial Disclosure Statement on a form

2  provided by the USAO and, within 30 days of defendant's entry of a

3  guilty plea, deliver the signed and dated statement, along with all

4  of the documents requested therein, to the USAO by either email at

5  usacac.FinLit@usdoj.gov or mail to the USAO Financial Litigation

6  Section at 300 N. Los Angeles St., Suite 7516, Los Angeles, CA 90012.

7     3.    Defendant further agrees to cooperate fully with the USAO,

8  the Federal Bureau of Investigation ("FBI"), the United States Secret

9  Service ("USSS"), and, as directed by the USAO, any other federal,

10  state, local, or foreign prosecuting, enforcement, administrative, or

11  regulatory authority.  This cooperation requires defendant to:

12        a.    Respond truthfully and completely to all questions

13  that may be put to defendant, whether in interviews, before a grand

14  jury, or at any trial or other court proceeding.

15        b.    Attend all meetings, grand jury sessions, trials or

16  other proceedings at which defendant's presence is requested by the

17  USAO or compelled by subpoena or court order.

18        c.    Produce voluntarily all documents, records, or other

19  tangible evidence relating to matters about which the USAO, or its

20  designee, inquires.

21     4.    For purposes of this agreement: (1) "Cooperation

22  Information" shall mean any statements made, or documents, records,

23  tangible evidence, or other information provided, by defendant

24  pursuant to defendant's cooperation under this agreement, pursuant to

25  the letter agreement previously entered into by the parties dated

26  October 31, 2019 (the "Letter Agreement"), and pursuant to the letter

27  agreement previously entered into by defendant and the U.S.

28  Attorney's Office for the Southern District of Georgia dated November

GA

7, 2019; and (2) "Plea Information" shall mean any statements made by defendant, under oath, at the guilty plea hearing and the agreed to factual basis statement in this agreement.

<u>THE USAO'S OBLIGATIONS</u>

5.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

d.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for violations of 18 U.S.C. §§ 1956(h) (Conspiracy to Engage in Money Laundering); 1349 (Conspiracy to Commit Wire Fraud, Mail Fraud, and Bank Fraud); 1343 (Wire Fraud); § 1344 (Bank Fraud); 1956 (Money Laundering); 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity); and 1028A (Aggravated Identity Theft) arising out of: (i) defendant's conduct described in the agreed-to factual basis set forth in paragraph 15 below or (ii) evidence recovered during the search of defendant's cell phone seized by USSS agents on or about October 17, 2019.   Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.

4

1  Defendant agrees that at the time of sentencing the Court may

2  consider the uncharged conduct in determining the applicable

3  Sentencing Guidelines range, the propriety and extent of any

4  departure from that range, and the sentence to be imposed after

5  consideration of the Sentencing Guidelines and all other relevant

6  factors under 18 U.S.C. § 3553(a).

7       e.   Recommend, pursuant to USSG § 5G1.3(d), that the Court

8  impose the sentence in this case to run concurrent to the sentence

9  imposed in <u>United States v. Ghaleb Alaumary</u>, Case No. 4:20-CR-027-RSB

10  (S.D. Ga.).

11       6.   The USAO further agrees:

12       a.   Not to offer as evidence in its case-in-chief in the

13  above-captioned case or any other criminal prosecution that may be

14  brought against defendant by the USAO, or in connection with any

15  sentencing proceeding in any criminal case that may be brought

16  against defendant by the USAO, any Cooperation Information.

17  Defendant agrees, however, that the USAO may use both Cooperation

18  Information and Plea Information: (1) to obtain and pursue leads to

19  other evidence, which evidence may be used for any purpose, including

20  any criminal prosecution of defendant; (2) to cross-examine defendant

21  should defendant testify, or to rebut any evidence offered, or

22  argument or representation made, by defendant, defendant's counsel,

23  or a witness called by defendant in any trial, sentencing hearing, or

24  other court proceeding; and (3) in any criminal prosecution of

25  defendant for false statement, obstruction of justice, or perjury.

26       b.   Not to use Cooperation Information against defendant

27  at sentencing for the purpose of determining the applicable guideline

28  range, including the appropriateness of an upward departure, or the

GA

sentence to be imposed, and to recommend to the Court that
Cooperation Information not be used in determining the applicable
guideline range or the sentence to be imposed.  Defendant
understands, however, that Cooperation Information will be disclosed
to the United States Probation and Pretrial Services Office and the
Court, and that the Court may use Cooperation Information for the
purposes set forth in U.S.S.G § 1B1.8(b) and for determining the
sentence to be imposed.

        c.    In connection with defendant's sentencing, to bring to
the Court's attention the nature and extent of defendant's
cooperation.

        d.    If the USAO determines, in its exclusive judgment,
that defendant has both complied with defendant's obligations under
paragraphs 2 and 3 above and provided substantial assistance to law
enforcement in the prosecution or investigation of another
("substantial assistance"), to move the Court pursuant to U.S.S.G.
§ 5K1.1 to fix an offense level and corresponding guideline range
below that otherwise dictated by the sentencing guidelines, and to
recommend a term of imprisonment within this reduced range.

                DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

    7.    Defendant understands the following:

        a.    Any knowingly false or misleading statement by
defendant will subject defendant to prosecution for false statements,
obstruction of justice, and perjury and will constitute a breach by
defendant of this agreement.

        b.    Nothing in this agreement requires the USAO or any
other prosecuting, enforcement, administrative, or regulatory

6

GA

1  authority to accept any cooperation or assistance that defendant may
2  offer, or to use it in any particular way.

3         c.   Defendant cannot withdraw defendant's guilty plea if
4  the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a
5  reduced guideline range or if the USAO makes such a motion and the
6  Court does not grant it or if the Court grants such a USAO motion but
7  elects to sentence above the reduced range.

8         d.   At this time, the USAO makes no agreement or
9  representation as to whether any cooperation that defendant has
10  provided or intends to provide constitutes or will constitute
11  substantial assistance.  The decision whether defendant has provided
12  substantial assistance will rest solely within the exclusive judgment
13  of the USAO.

14         e.   The USAO's determination whether defendant has
15  provided substantial assistance will not depend in any way on whether
16  the government prevails at any trial or court hearing in which
17  defendant testifies or in which the government otherwise presents
18  information resulting from defendant's cooperation.

19                        NATURE OF THE OFFENSE

20     8.   Defendant understands that for defendant to be guilty of
21  the crime charged in the Information, that is, Conspiracy to Engage
22  in Money Laundering, in violation of 18 U.S.C. § 1956(h), the
23  following must be true:

24         a.   There was an agreement between two or more persons
25             i.   to conduct a financial transaction involving
26  property that represented the proceeds of wire fraud (in violation of
27  Title 18, United States Code, Section 1343) or computer fraud (in
28  violation of Title 18, United States Code, Sections 1030(a)(2)(C),

GA

1   (a)(4)), where defendant knew that the property represented the

2   proceeds of some form of unlawful activity, and defendant knew that

3   the transaction was designed in whole or in part to conceal or

4   disguise the nature, location, source, ownership, or control of the

5   proceeds; or

6               ii.  to transport, transmit, or transfer, or attempt

7   to transport, transmit, or transfer, from a place in the United

8   States to or through a place outside the United States, a monetary

9   instrument or funds, which defendant knew represented the proceeds of

10  some form of unlawful activity, and defendant knew that the

11  transaction was designed in whole or in part to conceal or disguise

12  the nature, location, source, ownership, or control of the proceeds

13  of wire fraud (in violation of Title 18, United States Code, Section

14  1343) or computer fraud (in violation of Title 18, United States

15  Code, Sections 1030(a)(2)(C), (a)(4)); or

16              iii. to knowingly engage or attempt to engage in a

17  monetary transaction in the United States in criminally derived

18  property that had a value greater than $10,000 and was, in fact,

19  derived from wire fraud (in violation of Title 18, United States

20  Code, Section 1343) or computer fraud (in violation of Title 18,

21  United States Code, Sections 1030(a)(2)(C), (a)(4)); and

22         b.   defendant became a member of the conspiracy knowing of

23  at least one of its objects and intending to help accomplish it.

24                       PENALTIES AND RESTITUTION

25     9.   Defendant understands that the statutory maximum sentence

26  that the Court can impose for a violation of Title 18, United States

27  Code, Section 1956(h), as charged in the Information, is: 20 years

28  imprisonment; a 3-year period of supervised release; a fine of

GA

$500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10.  Defendant understands that defendant will be required to pay full restitution to the victim(s) of the offense to which defendant is pleading guilty. Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victim(s) of the offenses to which defendant is pleading guilty and in amounts greater than those alleged in the count to which defendant is pleading guilty. In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any counts dismissed and charges not prosecuted pursuant to this agreement as well as all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection with those counts and charges. The parties currently believe that the applicable amount of restitution is approximately $23,425,639.04, but recognize and agree that this amount could change based on facts that come to the attention of the parties prior to sentencing.

11.  Defendant agrees that any and all fines and/or restitution ordered by the Court will be due immediately. The government is not precluded from pursuing, in excess of any payment schedule set by the Court, any and all available remedies by which to satisfy defendant's payment of the full financial obligation, including referral to the Treasury Offset Program.

12.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.   Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

13.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.   Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.   Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

14.   Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.   Defendant may also be denied United States citizenship and admission to the United States in the future.

10

1  Defendant understands that while there may be arguments that
2  defendant can raise in immigration proceedings to avoid or delay
3  removal, removal is presumptively mandatory and a virtual certainty
4  in this case.  Defendant further understands that removal and
5  immigration consequences are the subject of a separate proceeding and
6  that no one, including his attorney or the Court, can predict to an
7  absolute certainty the effect of his conviction on his immigration
8  status.  Defendant nevertheless affirms that he wants to plead guilty
9  regardless of any immigration consequences that his plea may entail,
10  even if the consequence is automatic removal from the United States.

11                          FACTUAL BASIS

12      15.  Defendant admits that defendant is, in fact, guilty of the
13  offense to which defendant is agreeing to plead guilty.  Defendant
14  and the USAO agree to the statement of facts provided below and agree
15  that this statement of facts is sufficient to support a plea of
16  guilty to the charge described in this agreement and to establish the
17  Sentencing Guidelines factors set forth in paragraph 17 below but is
18  not meant to be a complete recitation of all facts relevant to the
19  underlying criminal conduct or all facts known to either party that
20  relate to that conduct.

21      Beginning no later than on or about August 7, 2018, and through
22  on or about October 17, 2019, defendant knowingly combined, agreed,
23  and conspired with multiple other persons ("coconspirators") to
24  conduct financial transactions into, within, and outside the United
25  States involving property that represented the proceeds of wire fraud
26  and computer fraud/hacking.  These coconspirators included the
27  persons referred to in the Information (which is attached hereto as
28  Exhibit A and incorporated herein by reference) as UICC 1, Ramon

GA

1 Olorunwa Abbas ("Abbas"), UICC 2, UICC 3, UICC 4, and UICC 5.  The
2 conspiracy targeted numerous victims, including banks and companies,
3 and laundered and/or attempted to launder funds fraudulently
4 obtained, and attempted to be fraudulently obtained, through
5 Automated Teller Machine ("ATM") cash-outs,[1] bank cyber-heists,[2] and
6 business email compromise ("BEC") frauds,[3] among other schemes.  The
7 victims of the conspiracy included the victims identified in the
8 Information as the Victim Indian Bank, BankIslami Pakistan Limited
9 ("BankIslami"), the Victim Maltese Bank, the Victim English Premier
10 League Club, the Victim U.K. Company, the Victim Federal Contractor,
11 the Victim Consumer Products Company, and the Victim Law Firm.

12 Defendant admits that he conspired with UICC 1, Abbas, UICC 2,
13 UICC 3, UICC 4, and UICC 5 to defraud these victims and launder funds
14 obtained from them in the manner described in the Information (and,
15 specifically, including Overt Acts 1 through 36), and that it was
16 reasonably foreseeable to defendant that the schemes intended to
17 defraud these victims of millions of dollars.  Defendant also admits
18 the truth of the allegations in Overt Acts 1 to 36.  Defendant knew
19 that the property obtained and attempted to be obtained represented,

20

21

22 [1] An ATM cash-out typically occurs where a hacker gains
unauthorized access to the computer(s) of a bank without
authorization, intercepts ATM transaction data, and causes fraudulent
23 ATM withdrawal requests to be approved, thereby causing a requesting
ATM to dispense cash to coconspirators.

24 [2] A cyber-heist typically occurs where a hacker has gained
access to the computer(s) of a bank without authorization and sent
25 messages through the Society for Worldwide Interbank Financial
Telecommunication ("SWIFT") communication system from the victim
26 bank's computer system, authorizing and causing fraudulent wire
transfers to bank accounts used and controlled by coconspirators.
27
[3] BEC schemes typically involve a hacker gaining unauthorized
28 access to a business email account, and attempting to trick a victim
into making an unauthorized wire transfer.

12

GA

1    and would represent, the proceeds of some form of unlawful activity;
2    that the transactions were, and would be, designed in whole or in
3    part to conceal or disguise the nature, location, source, ownership,
4    and control of the proceeds; and that the transactions with these
5    criminally derived proceeds, at times, exceeded $10,000.  Defendant
6    became a member of the conspiracy knowing of its objects and
7    intending to help accomplish them.  Multiple members of the
8    conspiracy took steps in furtherance of it, including defendant, as
9    described further below.

10        With respect to ATM cash-outs, defendant would communicate with
11   hackers and individuals committing fraud ("fraudsters"), or middle-
12   men for fraudsters, including UICC 1, who sought debit cards to which
13   the hackers would credit or transfer fraudulently obtained funds.
14   Defendant managed a crew of persons in the United States and Canada
15   (usually no fewer than 20 persons) who would withdraw cash from ATM
16   cash-out schemes, once hackers credited funds to those debit card
17   accounts.  The Victim Indian Bank and BankIslami were victims of such
18   ATM cash-out schemes, and defendant organized these crews and
19   coordinated the cash-out operations at the request of UICC 1.
20   Coconspirators withdrew funds from these ATM cash-out operations in
21   the Central District of California, among other locations in the U.S.
22   and Canada.

23        With respect to cyber-heists and BEC schemes, defendant would
24   communicate with fraudsters, or middle-men for fraudsters, who sought
25   bank accounts into which they could fraudulently induce victims to
26   deposit funds.  These individuals included UICC 1, Abbas, UICC 2, and
27   UICC 5.  Defendant, at times, also asked Abbas, UICC 2, and UICC 5
28   for bank accounts into which fraudulently obtained funds could be

GA

1    deposited.  Defendant knew that these fraudulent schemes included
2    bank cyber-heists, BEC schemes, and other fraud schemes.  The Victim
3    Maltese Bank was an intended victim of a cyber-heist, while the
4    Victim English Premier League Club, the Victim U.K. Company, the
5    Victim Federal Contractor, the Victim Consumer Products Company, and
6    the Victim Law Firm were intended victims of BEC schemes.  The
7    fraudsters perpetrating these schemes, along with the middle-men,
8    were largely located outside the United States.

9        For cyber-heists and BEC schemes, defendant would attempt to
10   locate an appropriate bank account -- often a U.S. business bank
11   account -- into which fraudulent funds could be deposited or he would
12   request such an account from a coconspirator.  If defendant himself
13   did not have access to a bank account that could be used at the time
14   to receive the fraudulently obtained funds and/or to launder those
15   funds, defendant would ask one or more coconspirators for a bank
16   account that could be used.

17       If a bank account with a specific business name was required,
18   defendant would coordinate with coconspirators to open bank accounts
19   that could receive fraudulently obtained funds.  These coconspirators
20   would, at defendant's direction, attempt to make the business name
21   look similar to the name of the company with which a victim company
22   was corresponding about a business transaction, which made it more
23   likely that the victim company would be tricked into fraudulently
24   transferring the funds.

25       Some of these bank accounts were in the Central District of
26   California.  Defendant requested that coconspirators open the bank
27   accounts identified in the Information as US Bank Account 1 and US
28   Bank Account 2 using specific names of companies for this reason.  In

order to create such a bank account in the Los Angeles-area, a coconspirator would sometimes file a fictitious business name statement with the Los Angeles County Registrar/Recorder's Office, which could be done for a small fee.  This step was necessary because banks would sometimes require official documentation showing the business existed before opening the business bank account.

Once a BEC scheme victim deposited funds into a fraudulently opened bank account, or funds were withdrawn through an ATM cash-out, defendant would coordinate with other coconspirators to obtain or move the funds, and then to further launder the funds.  This sometimes involved defendant directing a coconspirator to send the funds to other bank accounts used or controlled by coconspirators through international wires, withdrawing funds through checks or as cash, or further laundering funds by converting them to cryptocurrency.  Defendant used the bank account identified in the Information as the CIBC Account, which was held in Ontario, Canada by UICC 3, to launder and obtain funds from fraud schemes, including BEC schemes.

Defendant admits to the following approximate actual or intended loss amounts in connection with the victims identified in the Information:

- Victim Indian Bank: $16,307,642.20;
- BankIslami Pakistan Limited: $6,122,173.08;
- Victim Maltese Bank: $14,700,000.00 (€13,000,000);
- Victim English Premier League Club & Victim U.K. Company: $7,740,000.00 (£6,000,000);
- Victim Federal Contractor: $552,747.66;
- Victim Consumer Products Company: $1,170,175.21; and

GA

1          • Victim Law Firm: $922,857.76.

2      Defendant admits that all of the money laundering described

3  above was sophisticated, extensive, and involved numerous persons.

4                          SENTENCING FACTORS

5      16.  Defendant understands that in determining defendant's

6  sentence the Court is required to calculate the applicable Sentencing

7  Guidelines range and to consider that range, possible departures

8  under the Sentencing Guidelines, and the other sentencing factors set

9  forth in 18 U.S.C. § 3553(a).  Defendant understands that the

10 Sentencing Guidelines are advisory only, that defendant cannot have

11 any expectation of receiving a sentence within the calculated

12 Sentencing Guidelines range, and that after considering the

13 Sentencing Guidelines and the other § 3553(a) factors, the Court will

14 be free to exercise its discretion to impose any sentence it finds

15 appropriate up to the maximum set by statute for the crime of

16 conviction.

17     17.  Defendant and the USAO agree to the following applicable

18 Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 7 | [U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a)(1)] |
| Fraud scheme outside the U.S./sophisticated means | +2 | [U.S.S.G. § 2B1.1(b)(10)(B)] |
| Conviction under 18 U.S.C. § 1956 | +2 | [U.S.S.G. § 2S1.1(b)(2)(B)] |
| Sophisticated laundering | +2 | [U.S.S.G. § 2S1.1(b)(3)] |

26 The parties further agree that a loss amount between $25,000,000 and

27 $65,000,000, corresponding to a +22 offense level increase under

28 U.S.S.G. § 2B1.1.(b)(1)(L), is a reasonable and appropriate estimate

GA

1  of defendant's intended loss, and adequately accounts for the
2  seriousness of the offense.

3      Defendant and the USAO reserve the right to argue that
4  additional specific offense characteristics, adjustments, and
5  departures under the Sentencing Guidelines are appropriate.

6      18.  Defendant understands that there is no agreement as to
7  defendant's criminal history or criminal history category.

8      19.  Defendant and the USAO reserve the right to argue for a
9  sentence outside the sentencing range established by the Sentencing
10  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),
11  (a)(2), (a)(3), (a)(6), and (a)(7).

12                  WAIVER OF CONSTITUTIONAL RIGHTS

13      20.  Defendant understands that by pleading guilty, defendant
14  gives up the following rights:

15          a.   The right to persist in a plea of not guilty.

16          b.   The right to a speedy and public trial by jury.

17          c.   The right to be represented by counsel -- and if
18  necessary have the Court appoint counsel -- at trial.  Defendant
19  understands, however, that, defendant retains the right to be
20  represented by counsel -- and if necessary have the Court appoint
21  counsel -- at every other stage of the proceeding.

22          d.   The right to be presumed innocent and to have the
23  burden of proof placed on the government to prove defendant guilty
24  beyond a reasonable doubt.

25          e.   The right to confront and cross-examine witnesses
26  against defendant.

27

28

1          f.   The right to testify and to present evidence in

2  opposition to the charges, including the right to compel the

3  attendance of witnesses to testify.

4          g.   The right not to be compelled to testify, and, if

5  defendant chose not to testify or present evidence, to have that

6  choice not be used against defendant.

7          h.   Any and all rights to pursue any affirmative defenses,

8  Fourth Amendment or Fifth Amendment claims, and other pretrial

9  motions that have been filed or could be filed.

10         WAIVER OF APPEAL OF CONVICTION AND COLLATERAL ATTACK

11     21.  Defendant understands that, with the exception of an appeal

12  based on a claim that defendant's guilty plea was involuntary, by

13  pleading guilty defendant is waiving and giving up any right to

14  appeal defendant's conviction on the offense to which defendant is

15  pleading guilty.

16     22.  Defendant also gives up any right to bring a post-

17  conviction collateral attack on the conviction or sentence, except a

18  post-conviction collateral attack based on a claim of ineffective

19  assistance of counsel, a claim of newly discovered evidence, or an

20  explicitly retroactive change in the applicable Sentencing

21  Guidelines, sentencing statutes, or statutes of conviction.

22     23.  Defendant understands that these waivers include, but are

23  not limited to, arguments that the statute to which defendant is

24  pleading guilty is unconstitutional, and any and all claims that the

25  statement of facts provided herein is insufficient to support

26  defendant's plea of guilty.

27

28

1 <u>WAIVER OF VENUE</u>

2     24.  Having been fully advised by defendant's attorney regarding

3 the requirements of venue with respect to the offense to which

4 defendant is pleading guilty, to the extent the offense to which

5 defendant is pleading guilty were committed, begun, or completed

6 outside the Central District of California, defendant knowingly,

7 voluntarily, and intelligently waives, relinquishes, and gives up:

8 (a) any right that defendant might have to be prosecuted only in the

9 district where the offense to which defendant is pleading guilty were

10 committed, begun, or completed; and (b) any defense, claim, or

11 argument defendant could raise or assert based upon lack of venue

12 with respect to the offense to which defendant is pleading guilty.

13 <u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

14     25.  Defendant agrees that, provided the Court imposes a total

15 term of imprisonment on the count of conviction of no more than 240

16 months, defendant gives up the right to appeal all of the following:

17 (a) the procedures and calculations used to determine and impose any

18 portion of the sentence; (b) the term of imprisonment imposed by the

19 Court; (c) the fine imposed by the Court, provided it is within the

20 statutory maximum; (d) to the extent permitted by law, the

21 constitutionality or legality of defendant's sentence, provided it is

22 within the statutory maximum; (e) the amount and terms of any

23 restitution order; (f) the term of probation or supervised release

24 imposed by the Court, provided it is within the statutory maximum;

25 and (g) any of the following conditions of probation or supervised

26 release imposed by the Court: the conditions set forth in General

27 Order 20-04 of this Court; the drug testing conditions mandated by 18

28

1  U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use
2  conditions authorized by 18 U.S.C. § 3563(b)(7).

3      26.   The USAO agrees that, provided all portions of the sentence
4  are at or below the statutory maximum specified above, the USAO gives
5  up its right to appeal any portion of the sentence, with the
6  exception that the USAO reserves the right to appeal the amount of
7  restitution ordered if that amount is less than $23,425,639.04.

8                 WAIVER OF RETURN OF DIGITAL DATA

9      27.   Understanding that the government has in its possession
10  digital devices and/or digital media seized from defendant, defendant
11  waives any right to the return of digital data contained on those
12  digital devices and/or digital media and agrees that if any of these
13  digital devices and/or digital media are returned to defendant, the
14  government may delete all digital data from those digital devices
15  and/or digital media before they are returned to defendant.

16               RESULT OF WITHDRAWAL OF GUILTY PLEA

17      28.   Defendant agrees that if, after entering a guilty plea
18  pursuant to this agreement, defendant seeks to withdraw and succeeds
19  in withdrawing defendant's guilty plea on any basis other than a
20  claim and finding that entry into this plea agreement was
21  involuntary, then (a) the USAO will be relieved of all of its
22  obligations under this agreement, including in particular its
23  obligations regarding the use of Cooperation Information; (b) in any
24  investigation, criminal prosecution, or civil, administrative, or
25  regulatory action, defendant agrees that any Cooperation Information
26  and any evidence derived from any Cooperation Information shall be
27  admissible against defendant, and defendant will not assert, and
28  hereby waives and gives up, any claim under the United States

GA

1   Constitution, any statute, or any federal rule, that any Cooperation
2   Information or any evidence derived from any Cooperation Information
3   should be suppressed or is inadmissible; and (c) should the USAO
4   choose to pursue any charge that was either dismissed or not filed as
5   a result of this agreement, then (i) any applicable statute of
6   limitations will be tolled between the date of defendant's signing of
7   this agreement and the filing commencing any such action; and
8   (ii) defendant waives and gives up all defenses based on the statute
9   of limitations, any claim of pre-indictment delay, or any speedy
10  trial claim with respect to any such action, except to the extent
11  that such defenses existed as of the date of defendant's signing this
12  agreement.

RESULT OF VACATUR, REVERSAL OR SET-ASIDE

14      29.  Defendant agrees that if the count of conviction is
15  vacated, reversed, or set aside, both the USAO and defendant will be
16  released from all their obligations under this agreement.

EFFECTIVE DATE OF AGREEMENT

18      30.  This agreement is effective upon signature and execution of
19  all required certifications by defendant, defendant's counsel, and an
20  Assistant United States Attorney.

BREACH OF AGREEMENT

22      31.  Defendant agrees that if defendant, at any time after the
23  signature of this agreement and execution of all required
24  certifications by defendant, defendant's counsel, and an Assistant
25  United States Attorney, knowingly violates or fails to perform any of
26  defendant's obligations under this agreement ("a breach"), the USAO
27  may declare this agreement breached.  For example, if defendant
28  knowingly, in an interview, before a grand jury, or at trial, falsely

GA

accuses another person of criminal conduct or falsely minimizes
defendant's own role, or the role of another, in criminal conduct,
defendant will have breached this agreement.  All of defendant's
obligations are material, a single breach of this agreement is
sufficient for the USAO to declare a breach, and defendant shall not
be deemed to have cured a breach without the express agreement of the
USAO in writing.  If the USAO declares this agreement breached, and
the Court finds such a breach to have occurred, then:

      a.   If defendant has previously entered a guilty plea
pursuant to this agreement, defendant will not be able to withdraw
the guilty plea.

      b.   The USAO will be relieved of all its obligations under
this agreement; in particular, the USAO: (i) will no longer be bound
by any agreements concerning sentencing and will be free to seek any
sentence up to the statutory maximum for the crime to which defendant
has pleaded guilty; (ii) will no longer be bound by any agreements
regarding criminal prosecution, and will be free to criminally
prosecute defendant for any crime, including charges that the USAO
would otherwise have been obligated to dismiss or not to criminally
prosecute pursuant to this agreement; and (iii) will no longer be
bound by any agreement regarding the use of Cooperation Information
and will be free to use any Cooperation Information in any way in any
investigation, criminal prosecution, or civil, administrative, or
regulatory action.

      c.   The USAO will be free to criminally prosecute
defendant for false statement, obstruction of justice, and perjury
based on any knowingly false or misleading statement by defendant.

d.    In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

32.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.    Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.    Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

OFFICE NOT PARTIES

33.  Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

34.  Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 17 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

35.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to

24

1  fulfill all defendant's obligations under this agreement.  Defendant
2  understands that no one -- not the prosecutor, defendant's attorney,
3  or the Court -- can make a binding prediction or promise regarding
4  the sentence defendant will receive, except that it will be within
5  the statutory maximum.

NO ADDITIONAL AGREEMENTS

7      36.  Defendant understands that, except as set forth herein,
8  there are no promises, understandings, or agreements between the USAO
9  and defendant or defendant's attorney, and that no additional
10  promise, understanding, or agreement may be entered into unless in a
11  writing signed by all parties or on the record in court.

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

13      37.  The parties agree that this agreement will be considered
14  part of the record of defendant's guilty plea hearing as if the
15  entire agreement had been read into the record of the proceeding.

16  AGREED AND ACCEPTED

17  UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
18  CALIFORNIA

19  NICOLA T. HANNA
    United States Attorney
20

21  _____          November 3, 2020
    ANIL J. ANTONY                           Date
22  KHALDOUN SHOBAKI
    Assistant United States Attorneys
23

24  _____          11/02/2020
    GHALEB ALAUMARY                          Date
25  Defendant

26  _____          11/03/2020
    STEVEN FREY                              Date
27  Attorney for Ghaleb Alaumary

28

25

GA

## CERTIFICATION OF DEFENDANT

I understand, read, and comprehend English, and I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms.  I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____            11/02/2020
GHALEB ALAUMARY                              Date
Defendant


## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am GHALEB ALAUMARY's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client.  Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might

1   be asserted either prior to or at trial, of the sentencing factors

2   set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

3   provisions, and of the consequences of entering into this agreement.

4   To my knowledge: no promises, inducements, or representations of any

5   kind have been made to my client other than those contained in this

6   agreement; no one has threatened or forced my client in any way to

7   enter into this agreement; my client's decision to enter into this

8   agreement is an informed and voluntary one; and the factual basis set

9   forth in this agreement is sufficient to support my client's entry of

10   a guilty plea pursuant to this agreement.

11

12   STEVEN FREY               11/03/2020

     Attorney for Ghaleb Alaumary    Date

EXHIBIT  A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>GHALEB ALAUMARY,<br>  aka "G,"<br>  aka "Backwood,"<br>  aka "Big Boss,"<br><br>       Defendant. | CR No.<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 1956(h): Conspiracy to Engage in Money Laundering; 18 U.S.C. § 982 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   INTRODUCTORY ALLEGATIONS AND DEFINITIONS

1.   At times relevant to this Information:

Defendant

a.   Defendant GHALEB ALAUMARY, also known as ("aka") "G," aka "Backwood," aka "Big Boss" ("ALAUMARY"), was a resident of Canada.

Bank Accounts

a.   "US Bank Account 1" was a bank account at U.S. Bank, N.A., with the account number ending in 6155, which was held in Woodland Hills, California.

b.   "US Bank Account 2" was a bank account at U.S. Bank, N.A., with the account number ending in 7096, which was held in Inglewood, California.

c.   The "CIBC Account" was a bank account held at Canadian Imperial Bank of Commerce, with the account number ending in 1716, which was held in Ontario, Canada.

d.   The "Chase Account" was a bank account held at JP Morgan Chase Bank, N.A. ("Chase"), with the account number ending in 6628, which was held in Pearland, Texas.

Victims

e.   The "Victim Indian Bank" was a bank headquartered in India.

f.   BankIslami Pakistan Limited ("BankIslami") was a bank headquartered in Pakistan.

g.   The "Victim Maltese Bank" was a bank headquartered in Malta.

h.   The "Victim English Premier League Club" was a professional soccer club located in the United Kingdom.

i.   The "Victim U.K. Company" was a company located in the United Kingdom.

j.   The "Victim Federal Contractor" was a federal contracting business in the State of North Dakota.

k.   The "Victim Consumer Products Company" was a consumer products company in the State of North Carolina.

2

l.     The "Victim Law Firm" was a law firm in the State of New York.

<u>Definitions</u>

m.     An Automated Teller Machine ("ATM") cash-out occurs where a hacker gains unauthorized access to the computer(s) of a bank, intercepts ATM transaction data, and causes fraudulent ATM withdrawal requests to be approved, thereby causing a requesting ATM to dispense cash to coconspirators.

n.     A cyber-heist occurs where a hacker gains access to the computer(s) of a bank without authorization and sends messages through the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") communication system from the victim bank's computer system, authorizing and causing fraudulent wire transfers to bank accounts used and controlled by coconspirators.

o.     A business email compromise ("BEC") fraud occurs where a hacker tricks personnel of a victim company into making unauthorized wire transfers by (a) gaining unauthorized access to an email account used by a business; (b) blocking or redirecting communications to and/or from the email account; (c) and using the compromised email account or a separate fraudulent email account to communicate with personnel from a victim company (which may be the company to which the compromised account belongs, or another company doing business with that company).

p.     "Cryptocurrency" or "virtual currency" is a digital asset designed to work as a medium of exchange that uses cryptography to secure financial transactions, control the creation of additional units of the currency, and to verify and transfer assets. Cryptocurrency is typically accessed using secret or private

3

1  encryption "keys" which are commonly stored using a software

2  "wallet."

3  B.   OBJECTS OF THE CONSPIRACY

4       2.   Beginning on an unknown date, but no later than on or about

5  August 7, 2018, and continuing until on or about October 17, 2019, in

6  Los Angeles County, within the Central District of California, and

7  elsewhere, defendant ALAUMARY, and unindicted coconspirator #1

8  ("UICC 1"), unindicted coconspirator Ramon Olorunwa Abbas ("Abbas"),

9  unindicted coconspirator #2 ("UICC 2"), unindicted coconspirator #3

10 ("UICC 3"), unindicted coconspirator #4 ("UICC 4"), and unindicted

11 coconspirator #5 ("UICC 5"), together with others known and unknown

12 to the United States Attorney, knowingly conspired:

13       a.   to conduct and attempt to conduct financial

14 transactions, affecting interstate and foreign commerce, knowing that

15 the property involved in the financial transactions represented the

16 proceeds of some form of unlawful activity, which, in fact, involved

17 the proceeds of specified unlawful activity -- namely, obtaining

18 information from a protected computer, in violation of Title 18,

19 United States Code, Section 1030(a)(2)(C); accessing a protected

20 computer to defraud and obtain value, in violation of Title 18,

21 United States Code, Section 1030(a)(4); and wire fraud, in violation

22 of Title 18, United States Code, Section 1343 -- and knowing that the

23 transactions were designed in whole and in part to conceal and

24 disguise the nature, location, source, ownership, and control of the

25 proceeds, in violation of Title 18, United States Code, Section

26 1956(a)(1)(B)(i);

27       b.   to transport, transmit, and transfer, and attempt to

28 transport, transmit, and transfer, a monetary instrument and funds

4

from a place in the United States to a place outside of the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that the transportation, transmittal, and transfer were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity -- namely, obtaining information from a protected computer, in violation of Title 18, United States Code, Section 1030(a)(2)(C); accessing a protected computer to defraud and obtain value, in violation of Title 18, United States Code, Section 1030(a)(4); and wire fraud, in violation of Title 18, United States Code, Section 1343 --  in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

c.    to knowingly engage and attempt to engage in monetary transactions affecting interstate and foreign commerce involving criminally derived property of a value greater than $10,000, which property was derived from specified unlawful activity -- namely, obtaining information from a protected computer, in violation of Title 18, United States Code, Section 1030(a)(2)(C); accessing a protected computer to defraud and obtain value, in violation of Title 18, United States Code, Section 1030(a)(4); and wire fraud, in violation of Title 18, United States Code, Section 1343 -- in violation of Title 18, United States Code, Section 1957.

C.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

3.    The objects of the conspiracy were to be accomplished, in substance, as follows:

<u>ATM Cash-Outs</u>

a.    In an ATM cash-out scheme, after UICC 1 or another coconspirator had gained unauthorized access to the computer(s) of a bank, UICC 1 or another coconspirator would ask defendant ALAUMARY to recruit and organize coconspirators to withdraw cash from ATMs ("runners").

b.    At times, defendant ALAUMARY would provide UICC 1 or another coconspirator with debit card account numbers to which they could credit funds.

c.    UICC 1 or another coconspirator would provide defendant ALAUMARY with debit card account numbers and pin numbers that were to be used in the ATM-cash-out scheme.

d.    Defendant ALAUMARY or a coconspirator would code blank debit cards with the debit card account information provided by UICC or another coconspirator.

e.    UICC 1 or another coconspirator would cause fraudulent ATM withdrawal requests to be approved, which would cause a requesting ATM to dispense cash to runners who possessed the debit cards.

f.    Defendant ALAUMARY would correspond with runners, and other coconspirators who assisted defendant ALAUMARY in organizing the runners, including UICC 3 and UICC 4, to coordinate the withdrawal of cash from ATMs in the United States and Canada.

<u>Bank Cyber-Heists</u>

g.    In a bank cyber-heist scheme, after UICC 1 or another coconspirator had gained unauthorized access to the computer(s) of a bank, UICC 1 or another coconspirator would ask defendant ALAUMARY

for bank accounts that could be used to receive funds that would be fraudulently obtained by hackers through a bank cyber-heist.

h.   Defendant ALAUMARY would ask unindicted coconspirator Abbas and other coconspirators for bank accounts that could be used to receive the funds.

i.   Unindicted coconspirator Abbas and other coconspirators would provide account information for a bank account or bank accounts that could be used to receive fraudulently obtained funds, including the bank account number and the SWIFT code, or the international bank account number ("IBAN"), and defendant ALAUMARY would provide this information to UICC 1 or another coconspirator.

j.   UICC 1 or another coconspirator would, after hacking into the computer network of a victim bank, send a fraudulent message through the SWIFT system of the victim bank, directing a wire transfer from the victim bank to the bank account(s) identified to receive fraudulently obtained funds.

k.   Defendant ALAUMARY would correspond with unindicted coconspirator Abbas and other coconspirators to coordinate the receipt, and subsequent withdrawal, of cash from the bank accounts.

<u>BEC Schemes</u>

l.   In a BEC scheme, defendant ALAUMARY, on the one hand, and unindicted coconspirator Abbas, UICC 2, UICC 5, and other coconspirators, on the other hand, would request from each other a bank account that could be used to receive funds from a BEC scheme.

m.   Defendant ALAUMARY, on the one hand, and unindicted coconspirator Abbas, UICC 2, and UICC 5, on the other hand, would send each other account information for a bank account that could be used to receive fraudulently obtained funds, including the bank

account number and the SWIFT code, or the international bank account number ("IBAN").  Such a bank account would be opened by UICC 3 or UICC 4, or another coconspirator, to conceal the fraudulent nature of the transaction and the involvement of defendant ALAUMARY, unindicted coconspirator Abbas, UICC 2, UICC 5, and other coconspirators.

n.   Unindicted coconspirator Abbas, UICC 2, and UICC 5, or other coconspirators would communicate with a victim-company -- fraudulently pretending to be a company doing business with the victim-company -- and would provide the victim-company with instructions to wire transfer a payment to the bank account.

o.   After the victim-company had been fraudulently induced to wire transfer funds into the bank account, defendant ALAUMARY would correspond with unindicted coconspirator Abbas, UICC 2, UICC 3, UICC 4, and UICC 5 to coordinate the receipt, and subsequent withdrawal or transfer of those funds from the bank account.

<u>Further Money Laundering</u>

p.   After obtaining funds through an ATM cash-out, bank cyber-heist, or BEC scheme, defendant ALAUMARY, and UICC 1, unindicted coconspirator Abbas, UICC 2, UICC 3, UICC 4, and UICC 5, and other coconspirators, would further launder the funds through a variety of means, including wire transfer(s) to a bank account in the name of UICC 3 or additional bank accounts in the names of persons other than defendant ALAUMARY, UICC 1, unindicted coconspirator Abbas, UICC 2, UICC 4, and UICC 5; cash withdrawals and transfers; or exchanging the funds for cryptocurrency -- sometimes with the assistance of additional coconspirators.  This money laundering activity would include transfers of funds into, from, and through the United States.

q.    Defendant ALAUMARY and his coconspirators attempted to fraudulently obtain and launder hundreds of millions of dollars in this manner.

D.    OVERT ACTS

4.    In furtherance of the conspiracy, and to accomplish its objects, defendant ALAUMARY, and UICC 1, unindicted coconspirator Abbas, UICC 2, UICC 3, UICC 4, and UICC 5, together with others known and unknown to the United States Attorney, on or about the dates set forth below, committed and caused to be committed various overt acts, in the Central District of California and elsewhere, including, but not limited to, the following:

ATM Cash-Outs

Overt Act No. 1:    On or about August 11, 2018, and in the days following, defendant ALAUMARY communicated with UICC 1 and coordinated with runners to conduct withdrawals from ATMs and further launder funds, after hackers gained unauthorized access to the computer network of the Victim Indian Bank and caused ATMs to dispense approximately $16.3 million to coconspirators, including within the Central District of California.

Overt Act No. 2:    On or about October 27, 2018, and in the days following, defendant ALAUMARY communicated with UICC 1 and coordinated with runners to conduct withdrawals from ATMs and further launder funds, after hackers gained unauthorized access to the computer network of BankIslami and caused ATMs to dispense approximately $6.1 million to coconspirators, including within the Central District of California.

### Bank Cyber-Heists

**Overt Act No. 3:**   On or about January 16, 2019, defendant ALAUMARY sent electronic messages to unindicted coconspirator Abbas requesting two bank accounts that could each receive €5 million wire transfers from the Victim Maltese Bank.

**Overt Act No. 4:**   On or about January 16, 2019, unindicted coconspirator Abbas responded with electronic messages providing the account information for a bank account in Romania (the "Romanian bank account"), including the IBANs.

**Overt Act No. 5:**   On or about January 18, 2019, after defendant ALAUMARY sent an electronic message to unindicted coconspirator Abbas asking about the "maximum amount" the Romanian bank account could "handle in 24hr," unindicted coconspirator Abbas responded "It's for large amounts[.]"

**Overt Act No. 6:**   On or about January 18, 2019, defendant ALAUMARY sent electronic messages to unindicted coconspirator Abbas saying, "[m]y associates want u to clear as soon it hits . . . Cuz a recall can be," and, "if they don't notice we keep pumping."

**Overt Act No. 7:**   From on or about February 7, 2019 through on or about February 11, 2019, defendant ALAUMARY sent electronic messages to other coconspirators, requesting bank accounts that could be used to receive funds from the cyber-heist from the Victim Maltese Bank.

**Overt Act No. 8:**   On or about February 10, 2019, after defendant ALAUMARY sent electronic messages to unindicted coconspirator Abbas saying that he had "6 slots in total [¶] all 5m euro," and needed additional bank accounts to receive "big hit in 12th feb" that would "all credit same time," unindicted coconspirator

Abbas provided the account information for a bank account in Bulgaria, including the IBANs.

Overt Act No. 9:    On or before February 12, 2019, defendant ALAUMARY sent an electronic message to UICC 1 stating that defendant ALAUMARY could provide four bank accounts that could be used to receive funds from the cyber-heist of the Victim Maltese Bank -- three that could receive wire transfers in euros and one that could receive wire transfers in United States dollars.

Overt Act No. 10:   On or about February 12, 2019, defendant ALAUMARY sent an electronic message to unindicted coconspirator Abbas stating that €500,000 had been wired to the Romanian bank account that unindicted coconspirator Abbas had provided.

Overt Act No. 11:   On or about February 12, 2019, defendant ALAUMARY sent electronic messages to unindicted coconspirator Abbas stating that the fraudulent wire transfer of €500,000 had come from the Victim Maltese Bank, and that "we still have access and they didn't realize , we gonna shoot again tomoro am."

Overt Act No. 12:   On or about February 12, 2019, UICC 1 sent an electronic message to defendant ALAUMARY stating that the Victim Maltese Bank had discovered the fraudulent euro transfer, but that defendant ALAUMARY should check the United States bank account to see if that transfer was successful.

<u>BEC Schemes</u>

Overt Act No. 13:   On or about May 8, 2019, after defendant ALAUMARY sent electronic messages to unindicted coconspirator Abbas asking for a bank account that could be used in a scheme to "swap" the account on file and that the account be able to "handle millions and not block," unindicted coconspirator Abbas sent defendant

11

ALAUMARY the account information for a bank account in Mexico, including the account number and IBAN.

Overt Act No. 14:   On or about May 13, 2019, defendant ALAUMARY told unindicted coconspirator Abbas that the bank account in Mexico would be used to receive payments of £3-6 million per week, up to £100 million from the Victim English Premier League Club and £200 million from the Victim U.K. Company, and requested another bank account that could be used to receive fraudulent wire transfers.

Overt Act No. 15:   On or about August 14, 2019, defendant ALAUMARY instructed a coconspirator to open a business bank account in the name of a specific business ("Company A").

Overt Act No. 16:   On or about August 14, 2019, at the direction of defendant ALAUMARY, a coconspirator filed a fictitious business name statement with the Los Angeles County Registrar-Recorder/County Clerk ("LACRRCC") in the name of Company A.

Overt Act No. 17:   On or about August 14, 2019, at the direction of defendant ALAUMARY, a coconspirator opened US Bank Account 1 in Woodland Hills, California, in the name of Company A.

Overt Act No. 18:   On or about August 16, 2019, UICC 2 or a coconspirator fraudulently induced the Victim Federal Contractor through a BEC scheme to wire transfer approximately $13,966.00 to US Bank Account 1.

Overt Act No. 19:   On or about August 19, 2019, after defendant ALAUMARY sent UICC 3 an electronic message asking which bank account they would be using for "the big one tomorrow," defendant ALAUMARY and UICC 3 exchanged electronic messages and agreed to use the CIBC Account, which was opened in the name of UICC 3, to receive the fraudulent payment.

Overt Act No. 20:   On or about August 19, 2019, defendant ALAUMARY sent UICC 2 an electronic message containing the name, address, and social security number of the account holder of US Bank Account 1, as well as the bank account number, and the bank account username and password, for US Bank Account 1.

Overt Act No. 21:   On or about August 19, 2019, after receiving an electronic message from UICC 3 containing the business name, account number, SWIFT code, and business address for the CIBC Account, defendant ALAUMARY sent that information to UICC 2.

Overt Act No. 22:   On or about August 19, 2019, UICC 2 or a coconspirator fraudulently induced the Victim Federal Contractor through a BEC scheme to wire transfer approximately $538,781.66 to US Bank Account 1.

Overt Act No. 23:   On or about August 20, 2019, at the direction of defendant ALAUMARY, a coconspirator attempted a wire transfer of approximately $509,880 from US Bank Account 1 to the CIBC Account.

Overt Act No. 24:   On or about September 13, 2019, defendant ALAUMARY instructed UICC 4 to open a business bank account in the name of a specific business ("Company B").

Overt Act No. 25:   On or about September 17, 2019, at the direction of defendant ALAUMARY, UICC 4 and another coconspirator filed a fictitious business name statement with the LACRRCC in the name of Company B.

Overt Act No. 26:   On or about September 17, 2019, at the direction of defendant ALAUMARY, UICC 4 and another coconspirator opened US Bank Account 2 in Inglewood, California, in the name of Company B.

1      <u>Overt Act No. 27:</u>   On or about September 17, 2019, defendant
2  ALAUMARY sent UICC 5 an electronic message containing the name of the
3  account holder of US Bank Account 1, as well as the bank account
4  number and routing number for US Bank Account 2.

5      <u>Overt Act No. 28:</u>   On or about September 19, 2019, UICC 5 or a
6  coconspirator induced the Victim Consumer Products Company to wire
7  transfer approximately $1,170,175.21 to US Bank Account 2.

8      <u>Overt Act No. 29:</u>   On or about September 19, 2019, defendant
9  ALAUMARY sent electronic messages to UICC 4 saying "His doing t now,"
10 and "[c]heck the us bank 1.1."

11     <u>Overt Act No. 30:</u>   On or about September 19, 2019, defendant
12 ALAUMARY communicated by video chat with UICC 4, and thereafter sent
13 an electronic message to UICC 5 containing a mobile device screenshot
14 of an ATM receipt for US Bank Account 2 showing a balance of
15 $1,169,775.21.

16     <u>Overt Act No. 31:</u>   On or about September 19, 2019, defendant
17 ALAUMARY exchanged electronic messages with UICC 5 about a check, and
18 defendant ALAUMARY caused a coconspirator to send by FedEx -- to a
19 California address provided by UICC 5 -- a check of approximately
20 $772,000 drawn from US Bank Account 2.

21     <u>Overt Act No. 32:</u>   On or about October 15, 2019, unindicted
22 coconspirator Abbas or a coconspirator fraudulently induced the
23 Victim Law Firm to wire transfer approximately $922,857.76 from its
24 account at Quontic Bank, held in the State of New York, to the Chase
25 Account.

26     <u>Overt Act No. 33:</u>   On or about October 17, 2019, unindicted
27 coconspirator Abbas sent defendant ALAUMARY an electronic message
28 containing a photograph of a wire transfer confirmation relating to a

wire transfer of approximately $396,050 from the Chase Account to the CIBC Account.

Overt Act No. 34:   On or about October 17, 2019, defendant ALAUMARY informed UICC 3, through an electronic message, to look for a wire transfer of approximately $396,050 to the CIBC Account.

Overt Act No. 35:   On or about October 17, 2019, while within the Central District of California, UICC 3 informed defendant ALAUMARY, through an electronic message, that the sum of approximately $396,050 had been credited to the CIBC Account.

Overt Act No. 36:   On or about October 17, 2019, defendant ALAUMARY told unindicted coconspirator Abbas, through an electronic message, that the wire transfer of approximately $396,050 from the Chase Account to the CIBC Account had been completed.

1

### FORFEITURE ALLEGATION ONE

2

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

3       1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States will seek

5   forfeiture as part of any sentence, pursuant to Title 18, United

6   States Code, Section 982(a)(1) and Title 28, United States Code,

7   Section 2461(c), in the event of the defendant's conviction of the

8   offenses set forth in Count One of this Information.

9       2.   The defendant, if so convicted, shall forfeit to the United

10  States of America the following:

11      (a)   Any property, real or personal, involved in such

12  offense, and any property traceable to such property; and

13      (b)   To the extent such property is not available for

14  forfeiture, a sum of money equal to the total value of the property

15  described in subparagraph (a).

16      3.   Pursuant to Title 21, United States Code, Section 853(p),

17  as incorporated by Title 18, United States Code, Section 982(b)(1),

18  and Title 18, United States Code, Section 982(b)(2), the defendant,

19  if so convicted, shall forfeit substitute property, if, by any act or

20  omission of the defendant, the property described in the preceding

21  paragraph, or any portion thereof: (a) cannot be located upon the

22  exercise of due diligence; (b) has been transferred, sold to, or

23  deposited with a third party; (c) has been placed beyond the

24  jurisdiction of the court; (d) has been substantially diminished in

25  value; or (e) has been commingled with other property that cannot be

26  divided without difficulty.  Substitution of assets shall not be

27  ordered, however, where the convicted defendant acted merely as an

28  intermediary who handled but did not retain the property in the

1  course of the money laundering offense unless the defendant, in

2  committing the offense or offenses giving rise to the forfeiture,

3  conducted three or more separate transactions involving a total of

4  $100,000.00 or more in any twelve-month period.

NICOLA T. HANNA
United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, Cyber & Intellectual Property
  Crimes Section

ANIL J. ANTONY
Assistant United States Attorney
Deputy Chief, Cyber & Intellectual
  Property Crimes Section

KHALDOUN SHOBAKI
Assistant United States Attorney
Cyber & Intellectual Property Crimes
  Section

17